**Robert E. KEENER, Keener Restaurants, Inc. & Leen-Keen Incorporated, Plaintiffs-Appellants-Cross-Appellees,**

v.

**SIZZLER FAMILY STEAK HOUSES, Defendant-Appellee-Cross-Appellant.**

**No. 77–1768.**

United States Court of Appeals, Fifth Circuit.

June 20, 1979.

454

Thomas L. Cantrell, Bennie R. Juarez, Dallas, Tex., for plaintiffs-appellants-cross-appellees.

Rodney K. Caldwell, Houston, Tex., for defendant-appellee-cross-appellant.

Before COLEMAN, GODBOLD and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge.

The opinion of the District Court in this case is reported, *Keener v. Sizzler Family Steak Houses*, 424 F.Supp. 482 (N.D.Tex. 1977).

As there reported, the District Court awarded $10,000 in damages and $7,000 in attorneys' fees for breach of contract. Recovery on two antitrust claims was denied. The Keener interests have appealed on the ground that the damage and attorneys' fees awards were inadequate. They also challenge the denial of recovery on the antitrust claims.

Sizzler Family Steak Houses cross appeals as to liability for breach of contract.

We affirm the Judgment of the District Court, except on the quantum of damages on the breach of contract issue. This point is remanded for further findings.

## THE FACTS

In 1965 Keener and his wife opened their first Sizzler restaurant in Farmers Branch, a suburb of Dallas, pursuant to a contract with Lone Star Sizzler, Inc., which was the licensee of Sizzlers, Inc. (defendant's predecessor) for the state of Texas. The Keeners were moderately successful in Farmers Branch and desired to expand. Accordingly, in late 1967 or early 1968, Keener signed another licensing contract with Lone Star Sizzler, under the terms of which he would be the only licensee for North Dallas within five miles of a specified location.[1] The North Dallas restaurant was a complete

failure and lost money virtually from the day it opened in July 1968 until the day it closed in January 1971. Although Keener worked part-time in the North Dallas restaurant and his wife was there full-time, they paid themselves no salary for these efforts. Had they done so, the losses of Keener Restaurants, Inc., Keener's company which owned the franchise rights, would have been much greater. During this period of operation, plaintiffs were delinquent in the payment of rent and franchise royalties on several occasions.

Meanwhile, the defendant acquired Sizzlers, Inc. in July 1967, and it subsequently purchased the Texas statewide license in May 1968, which purchase also included the rights of licensor under the two contracts with the Keeners. After a study of the business, the new owners concluded that the image of Sizzler restaurants had to be improved, and they invested more than $100,000 in the development of plans and specifications for a "new image" building. Both the Farmers Branch and North Dallas restaurants were "old image" Sizzlers.

Despite the losses incurred by the North Dallas restaurant, all parties felt that the area was one of enormous potential due to the relatively affluent neighborhood. For its part, the defendant never kept secret its desire to open one or more new image Sizzlers in North Dallas. The District Judge found several facts which directly bore on defendant's intent to develop the North Dallas area:

> Prior to the closing of the North Dallas unit, Mr. Rush Backer, President of the Defendant corporation, recognized the business potential of the densely populated and prosperous territory within Keener's five-mile radius and as early as 1970 had attempted to strike a deal with Plaintiffs to permit the opening of company-owned units within Plaintiffs' territory. Upon being refused by the Keeners, Backer wrote an internal memorandum

---

1. Apparently, the five-mile radius provision was in the second contract signed by the parties. The court below found that the provision

was enforceable, and the defendant has not seriously challenged that finding.

asking his subordinates to keep him advised whenever the Keeners should fall behind on royalty payments.

After Plaintiffs closed their North Dallas store in early 1971, they advised Backer that they were planning to open a new unit in the territory within a year as required by the franchise agreement. In another memorandum, Backer noted prior to Mrs. Keener's visit to California to discuss reopening: "I plan to take a very firm position with her [Mrs. Keener] whereby we obtain the territory free and clear without any reservations. Whether or not any financial consideration is paid is yet to be determined. I will be governed by the wording of the franchise agreements . . . ." *Keener v. Sizzler Family Steak Houses,* 424 F.Supp. 482, 483–84 (N.D.Tex.1977).

The District Judge also found several facts which supported his ultimate conclusion that the defendant had prevented, hindered, or delayed Keener from performing the contract. Specifically, the Judge found that:

First, Defendant's President attempted to discourage Plaintiffs from opening a new restaurant telling them in a March 1971 telephone conversation that they were too old to undertake such an enterprise. Defendant next informed Plaintiffs that any new unit would have to be in a building constructed in compliance with plans and specifications for the so-called "new-image" Sizzler, the construction of which cost nearly three times as much as the "old-image" buildings which were acceptable to Defendant at the time the original franchise agreement between Plaintiffs and Defendant was signed.

By letter of April 3, 1971, Defendant advised Plaintiffs that they would have to prove cash value of $50,000 and net worth of $200,000 to open a new North Dallas location. Further, Plaintiffs would be required to use a particular building contractor who had assisted in the development of the plans for the "new-image" buildings.

When Plaintiffs persevered in their efforts to open a new North Dallas unit, Defendant declined to make available the plans and specifications for a "new-image" building. Without such plans, Plaintiffs were unable to proceed effectively in their efforts to secure necessary construction financing. 424 F.Supp. at 484.

## THE ANTITRUST CLAIMS

██ Plaintiff first contends that requiring the new image restaurant to be built by a particular contractor constituted an illegal tying arrangement. According to Keener, the trademark was the tying product and was evidence of sufficient economic power "to appreciably restrain free competition in the market for the tied product". *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Keener also claims that the building was the tied product and represented a "not insubstantial" amount of interstate commerce. *See id.* The fatal defect in this analysis, however, is that the defendant had no financial interest in or connection with the building contractor whom it had designated to erect the new building. It had no stake in that contractor's business, it derived no income from his sales, and it would receive no rental income from the building. There is no illegal tying arrangement where a "tying" company has absolutely no interest in the sales of a third company whose products are favored by the tie-in. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 5 Cir. 1977, 549 F.2d 368, 377 & n. 9; *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 7 Cir. 1978, 585 F.2d 821, 835.

Furthermore, Keener failed to prove any damages whatsoever as a result of this alleged tie. The undisputed evidence at trial indicated that the favored contractor would in all probability have been able to erect the new image Sizzler for a substantially lower price than any local contractor due to his experience and familiarity with the Sizzler design. The District Judge was entirely correct in denying relief on this claim.

Second, Keener complains of an alleged price-fixing conspiracy which had both vertical and horizontal aspects. Evidence of vertical price-fixing consisted mainly of the contracts between plaintiffs and the defendant which clearly set prices for such items as hamburger, steak sandwich, top sirloin steak, New York steak, hamburger steak, fried shrimp, and salad. The contracts also provided that prices for these items were not to be changed "until further notice in writing from Sizzlers, Inc." Evidence on the alleged horizontal price-fixing consisted mainly of testimony as to discussion at meetings which took place several times a year on an irregular schedule. The operators of Sizzler restaurants in the Dallas-Fort Worth area attended these meetings, along with management representatives of Sizzler. Defendant's representatives acted as moderators or leaders of the discussions of prices and often made suggestions. Eventually the group reached a consensus as to the prices which would be charged for certain items, and the participants either explicitly or implicitly agreed to charge these prices.

Based upon these facts, the District Judge found as a fact that "Defendant's pricing policy was intended solely to suggest prices for products as an aid to franchises". 424 F.Supp. at 485. This finding, of course, must be reviewed under the clearly erroneous standard.

■ Even if we were to assume that the alleged illegal price-fixing occurred, we nevertheless would be compelled to hold that the plaintiffs were not entitled to recover because they completely failed to prove any damages flowing or resulting from the assertedly anti-competitive activity. The *only* evidence adduced by the plaintiffs on this point was Mr. Keener's self-serving statement that if he had been free to raise prices, he could have increased his volume "anywhere from one to three percent". By raising his prices "ten to twenty cents per annum", Keener felt that his gross sales would have increased by the stated one to three percent and that the additional income would have represented pure profit because his fixed and variable costs had already been accounted for.

This evidence falls short of the standard of proof required to establish the quantum of damages in an antitrust case. It has long been the rule that in an antitrust case "there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount." *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). Despite the leniency in the standards for proving the measure of damages, it is still the law that a verdict for damages may not be based upon speculation and guesswork. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Although this case was not tried to a jury, no lesser standard of proof applies where a judge tried it.

The Judge found that the proof simply failed to establish the measure of damages. Our cases have consistently required more evidence than the self-serving speculation of the plaintiff to support an award of damages. *See, e. g., Kestenbaum v. Falstaff Brewing Corp.,* 5 Cir. 1978, 575 F.2d 564, 569; *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 5 Cir. 1976, 537 F.2d 1347, 1371-72, *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Shumate & Co. v. National Ass'n of Securities Dealers, Inc.,* 5 Cir. 1975, 509 F.2d 147, 153, *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975). Simply stated, the evidence on the quantum of damages did not represent "substantial evidence" upon which an award could have been based. *See Yoder Bros., Inc., supra,* 537 F.2d at 1371-72 & n. 25.

### THE BREACH OF CONTRACT

■ In the statement of facts we have referred to Sizzler's attitude and activities with reference to a declared purpose of obtaining "the territory free and clear without any reservations". The findings of the District Court on this subject are not clearly erroneous. Quite obviously, the Court was

convinced from the evidence that the defendant consciously set out to delay the new restaurant project beyond the expiration of the one-year option period specified in the contract, thus *preventing* the Keeners from exercising their rights thereunder. *See, e. g., Smith v. Lipscomb,* 13 Tex. 532 (1855); *American Nat. Ins. Co. v. Tri-Cities Const., Inc.,* 551 S.W.2d 106, 108 (Tex.Civ.App. 1977); *American Founders Life Ins. Co. v. Wehling,* 561 S.W.2d 911, 915 (Tex.Civ.App. 1978).

■ However, we cannot affirm the court below on the quantum of damages. In awarding $10,000 in damages, the Court stated that "the original franchise fee was $3,500, but Plaintiffs were offered $10,000 for the franchise by a third party and it is the opinion of the Court that this $10,000 offer constituted the fair value of the franchise at the time of the breach." 424 F.Supp. at 484. Apparently, the court relied exclusively upon the hearsay testimony, which was not objected to, in fixing the amount of damages. Although he properly refused to consider the plaintiff's total sales figures, which the plaintiff claims represented the "going business" value of the franchise, there was other evidence on the franchise value, particularly the testimony concerning the $20,000 offered for a smaller territory within the area covered by Keener's franchise. The written findings of the District Court do not indicate that this evidence was credited, rejected, or considered in assessing damages. Without the benefit of further written reasons, we cannot affirm on the damages issue based solely upon the offer to buy expressed by a third person and offered through hearsay testimony. We must emphasize, however, that we are not saying that the award of damages must be fixed at some multiple of the $20,000. For instance, the Keener's proposed location apparently is in a fiercely competitive area and might not be as valuable as the second location, even though the area of exclusivity was smaller for the latter than for the Keener's franchise. The more relevant criterion is the degree and intensity of inter-brand, not intrabrand, competition.

■ It is also clear to us that the plaintiff cannot recover future profits. Under Texas law prospective profits are not recoverable for a newly established business or for a business which has operated at a loss. *See, e. g., City of Austin v. Teague,* 570 S.W.2d 389 (Tex.1978); *Harper Building Systems v. Upjohn Company,* 564 S.W.2d 123 (Tex.Civ.App.1978); *Southwest Bank and Trust Company v. Executive Sportsman Association,* 477 S.W.2d 920 (Tex.Civ. App.1972); *Cone v. City of Lubbock,* 431 S.W.2d 639 (Tex.Civ.App.1968); *Atomic Fuel Extraction Corp. v. Slick's Estate,* 386 S.W.2d 180 (Tex.Civ.App.1964). Our cases have consistently recognized this principle of Texas law. *See, e. g., McBrayer v. Teckla, Inc.,* 5 Cir. 1974, 496 F.2d 122, 128; *Norris v. Bovina Feeders, Inc.,* 5 Cir. 1974, 492 F.2d 502, 506; *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 5 Cir. 1973, 481 F.2d 781, 803. Keener's North Dallas Sizzler lost money from the very beginning.

On the remand, the District Court should reconsider damages on the basis of all the evidence before it and make specific findings as to what evidence it finds probative and what evidence it rejects. We leave it to the discretion of the judge as to whether the parties should be allowed the opportunity of submitting additional evidence on the quantum of damages.

We also affirm the court below on the question of attorneys' fees. We see no abuse of discretion on this point.

AFFIRMED IN PART AND REMANDED IN PART.