Gary CROSSLAND, et al., Plaintiffs-Appellees Cross-Appellants,

v.

CANTEEN CORPORATION,
Defendant-Appellant
Cross-Appellee.

Nos. 82–1141 and 82–1344.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1983.

Rehearing Denied Sept. 30, 1983.

Mark Howell, El Paso, Tex., Robert E. Mason, H. Blair White, Chicago, Ill., for defendant-appellant cross-appellee.

Kenneth L. King, Dallas, Tex., for plaintiffs-appellees cross-appellants.

Before GOLDBERG, GEE and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This case arises out of a business relationship gone sour. The individual plaintiff, Gary Crossland, is the principal shareholder of each of the two corporate plaintiffs, Garland Company and Canteen Southwest, Inc. The plaintiffs operated a vending machine business that for a time held a franchise from the defendant, Canteen Corporation. After Canteen ended the franchise relationship, the plaintiffs filed this suit, alleging violations of the antitrust laws and the Texas Deceptive Trade Practices Act, common-law fraud, conversion, and breach of contract. Canteen counterclaimed for breach of contract. Both sides now appeal from a judgment almost totally in favor of the plaintiffs.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. The Business Relationship.

Crossland started a vending machine business in El Paso, Texas, in the early 1960s. In 1969, he incorporated Garland Company to run that business. Although Garland had apparently had credit problems for some time, in 1973 it bid successfully for the vending business at Fort Bliss, Texas. The expansion to serve Fort Bliss evidently exacerbated Garland's financial problems.

Beginning in 1972, there were negotiations between Canteen and Crossland about making Garland a Canteen franchisee. In August, 1974, the parties agreed that Garland would receive a franchise and that Canteen would provide the business with some badly needed capital by buying all of Garland's vending equipment for $350,000

and then leasing the equipment back to Garland. On October 10, 1974, Canteen and Crossland entered into a franchise agreement, which Crossland immediately assigned to Canteen Southwest, a new corporation formed to operate Garland's business as a Canteen franchisee. (The business, however, continued to use the name Garland.)

Unfortunately, the new Canteen franchise was, if anything, less successful than Garland had been on its own. The franchise's debt to Canteen for franchise fees, lease payments on equipment, and products bought from Canteen for resale in the machines mounted rapidly. By April, 1976, Garland allegedly owed Canteen approximately $320,000, and litigation ensued. In September, 1976, the parties settled: Garland paid Canteen $45,000 and gave it a note for the balance of the debt. The note was secured by Garland's assets. Garland's debt continued to increase, however, and allegedly reached $420,000 by April, 1977.

At that point, the parties again negotiated an agreement, which was signed on May 5, 1977. Under this contract, Canteen was to audit Garland's business. Canteen would value each Garland asset at the higher of its book value or market value, and credit Garland with $100,000 for its location contracts and $120,000 for a covenant not to compete. Canteen would then take over Garland's business, and the parties would settle in cash any difference between the value of the business and the debt to Canteen.

After Canteen performed the audit, it found that Garland still owed it $15,800. The plaintiffs refused to accept the audit figures and brought this suit.

### B. The Suit.

The plaintiffs raised a bewildering array of claims. First, they alleged that Canteen had violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and section 3 of the

Clayton Act, 15 U.S.C. § 14 (1976), by tying the Canteen franchise to each of four separate products: the vending machines involved in the original sale-leaseback arrangement; vending machines subsequently acquired by Garland; food products for resale in the machines; and cigarettes, also for resale in the machines. Second, the plaintiffs asserted that Canteen had made a variety of false representations in order to induce the plaintiffs to enter into the franchise agreement. These were claimed both to amount to common-law fraud and to violate the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.50. There were three other alleged violations of the DTPA: the tying arrangements described above; Canteen's failure, contrary to representations made before the execution of the franchise agreement, to assume Garland's leases of certain vending equipment; and Canteen's calculation of rentals for vending equipment it leased to Garland from a base figure of 110% of the equipment's cost, when Canteen had told the plaintiffs before the franchise agreement was entered into that Canteen's cost would be the base figure. Next, the plaintiffs claimed that Canteen had on two occasions, once in 1975 and once in 1977, junked vending equipment that Garland owned or had leased. Finally, the plaintiffs sought damages because Canteen allegedly breached the May 5, 1977 audit contract by undervaluing Garland's assets and overvaluing its liabilities. Canteen, as noted above, counterclaimed for the $15,800 that it maintained the plaintiffs owed it under the May, 1977 audit agreement.

### C. The Verdict and Judgment.

■ The case was sent to the jury on special interrogatories—38 or 133 questions, depending on how one counts them. On the tying claims,[1] the jury found ties of vending

---

1. Only the Sherman Act claim was submitted to the jury. The Clayton Act requires that both the tying and the tied products be goods. 15 U.S.C. § 14 (1976); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048–49 n. 5 (5th Cir.1982), *cert.*

*denied*, —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Advance Business Sys. & Supply Co. v. SCM Corp.*, 415 F.2d 55, 64 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). The alleged tying product here was the Canteen franchise, which is an

machines and cigarettes, but not food; however, the jury found that the ties did not affect a "not insubstantial" amount of interstate commerce. Damages were found to be $10,000. On the plaintiffs' motion for judgment notwithstanding the verdict, the district judge ruled that the jury had obviously been confused by the double negative in the question about the amount of commerce and that the evidence would only support a finding that a not insubstantial amount of commerce had been affected. He therefore entered judgment for the plaintiffs for $10,000, which was automatically tripled. 15 U.S.C. § 15 (Supp. V 1981).

The common-law fraud claim was submitted as a single interrogatory with ninety-six subparts—a grid listing sixteen alleged misrepresentations and asking six questions about each. The jury found for the plaintiffs on seven of the misrepresentations; it assessed actual damages of $37,064 and punitive damages of $135,000.

The jury also found for the plaintiffs on all of the DTPA claims. It awarded $250,-000 for the misrepresentations that induced the plaintiffs to enter into the franchise agreement, $10,000 on the tying claim as a DTPA violation, $117,000 for the failure to assume Garland's equipment leases, and $70,000 for the failure to base equipment rental payments on the cost of the equipment rather than 110% of the cost. Each of these amounts was automatically tripled. Tex.Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon 1977) (amended 1979). The jury also awarded the plaintiffs $300,000 for their attorneys' fees. *Id.*

Each side received damages on its breach-of-contract claim. The plaintiffs were awarded $41,696, but were found to owe Canteen $6560. Finally, the jury found that Canteen had converted vending equipment and that the plaintiffs should receive actual damages of $29,782 for machines they had owned and $3600 for machines they had leased, as well as punitive damages of $65,000.

Canteen moved successfully for judgment notwithstanding the verdict on the conversion claim. At the close of the plaintiffs' case, the district judge had directed a verdict for Canteen on the 1975 conversion claim because the statute of limitations had run. Thus, only the 1977 conversion claim went to the jury. The district judge found, however, that the jury's actual damages awards were clearly based on the plaintiffs' evidence on the 1975 scrapping, since the awards were in the exact amounts claimed for the earlier incident. He further found that the plaintiffs had totally failed to prove damages from the 1977 conversion, and he consequently entered judgment for Canteen. The punitive damages award necessarily fell with the actual damages.

The parties made various post-trial motions attacking the verdict, but except as noted above they were denied. The plaintiffs moved for an award of attorneys' fees on their antitrust claim. *See* 15 U.S.C. § 15 (Supp. V 1981). The district court granted the motion and determined that $125,000 was an appropriate amount.

Canteen has appealed virtually every aspect of the judgment that favored the plaintiffs, who in turn have cross-appealed the directed verdict and judgment notwithstanding the verdict on the conversion claims. The plaintiffs further object to various evidentiary rulings and instructions that allegedly limited their recovery. Finally, the plaintiffs appeal the district court's refusal to permit a mid-trial amendment to the complaint to plead the Texas-law prerequisites to an award of attorneys' fees on a breach-of-contract claim. We address the parties' claims in no particular order.

## II. THE DTPA CLAIMS.

■ Before a private plaintiff may sue under the DTPA, he must be a "consumer" within the meaning of that statute. Tex. Bus. & Com.Code Ann. § 17.50(a); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 538 (Tex.1981); *Riverside National Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.

intangible, not a good. The plaintiffs thus      could not recover under the Clayton Act.

1980). The definition of "consumer" has, however, been amended several times, so it is important to determine which version applies to a given claim. The general rule is that the governing version is that in force when the allegedly deceptive acts took place. *Cameron, supra,* 618 S.W.2d at 538 n. 1; *Riverside National Bank, supra,* 603 S.W.2d at 172; *Woods v. Littleton,* 554 S.W.2d 662, 665 (Tex.1977). Where the deceptive act is the breach of a prior representation, it is the date of the representation, not of the breach, that controls. *L & M–Surco Manufacturing, Inc. v. Winn Tile Co.,* 580 S.W.2d 920, 923–24 (Tex.Civ.App.—Tyler 1979, writ dism'd); *Cape Conroe Ltd. v. Specht,* 525 S.W.2d 215, 219–20 (Tex.Civ.App.—Houston [14th Dist.] 1975, no writ).

■ With these principles in mind, we turn to the facts of this case. There were four types of DTPA violations alleged: general misrepresentations to induce the plaintiffs to enter into the franchise agreement; failure to honor an agreement to assume certain equipment leases; failure to calculate lease payments on the cost of the equipment; and tying the purchase or lease of various products to the franchise agreement. The general misrepresentations clearly took place before the franchise agreement was signed in October, 1974, since the jury found that they were "designed to induce" the plaintiffs to enter into the agreement. The 1973 version of the DTPA thus governs this claim.

The interrogatories on the lease assumption and rental overcharge claims were confined to failures to make payments on the assumed leases and rental overcharges that occurred after September 1, 1975, the effective date of the 1975 amendments to the DTPA. Nevertheless, both practices were deceptive only because of earlier representations that Canteen would act differently. Both of these representations were also submitted to the jury as instances of common-law fraud; on the fraud interrogatories, the jury found that the representations were made in order to persuade the plaintiffs to enter into the franchise agreement. The representations were thus necessarily made before October, 1974, and the 1973 version of the DTPA is again the relevant one. *L & M–Surco, supra; Cape Conroe Ltd., supra.*

The tying claims present the most difficult problem, because there are no Texas cases on point. By analogy to *L & M–Surco, supra,* and *Cape Conroe Ltd., supra,* however, it would appear that the violation should be viewed as occurring when the tie is originally imposed, and not when each subsequent purchase or lease payment is made. The alleged sale-leaseback tie was established by the agreements of August and October, 1974, and the cigarette and subsequently-acquired vending machine ties were alleged to have existed from the beginning of the franchise relationship.[2] Thus, once again, the relevant DTPA is the 1973 version.

■ The 1973 DTPA defined a "consumer" as "*an individual* who seeks or acquires by purchase or lease, any goods or services." Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon 1973) (superseded) (emphasis added). A corporation could not be a "consumer" under the Act until the 1975 amendments became effective. *L & M–Surco, supra,* 580 S.W.2d at 922–23. Since we have decided that the 1973 version of the Act governs all of the DTPA claims in this suit, it follows that the corporate plaintiffs simply had no cause of action. Tex.Bus. & Com.Code Ann. § 17.50(a); *Riverside National Bank, supra.*

■ It remains to be determined whether Crossland himself could recover on these claims.[3] We hold that he could not. To

---

**2.** In our discussion of the cigarette tie in part III.C *infra,* we note that the conditions of the alleged tie changed in July, 1975, when Garland acquired a tax-stamping machine for cigarettes. Even if this change of circumstances is viewed as the beginning of a new and separate tie, the 1973 DTPA remains the relevant version; the

1975 amendments did not become effective until September 1, 1975. Tex.Bus. & Com.Code Ann. § 17.45 (Vernon 1975).

**3.** Crossland argues that even if the corporations may not sue, he may sue derivatively for their injuries. This is incorrect: a derivative

qualify as a consumer under any version of the Act, a plaintiff must "seek[ ] or acquire[ ] by purchase or lease . . . goods or services." Tex.Bus. & Com.Code Ann. § 17.45(4). Further, the goods or services acquired or sought must be the foundation of the suit. *Cameron, supra,* 618 S.W.2d at 539; *Riverside National Bank, supra,* 603 S.W.2d at 173–76; *Snyders Smart Shop, Inc. v. Santi, Inc.,* 590 S.W.2d 167, 170 (Tex. Civ.App.—Corpus Christi 1979, no writ); *Exxon Corp. v. Dunn,* 581 S.W.2d 500, 501 (Tex.Civ.App.—Dallas 1979, no writ).

■ Crossland simply did not seek or acquire goods or services covered by the 1973 Act. After Garland was incorporated in 1969, the vending business was conducted entirely through corporations. The only relevant thing that Crossland did in his individual capacity was sign the Canteen franchise agreement. Because he immediately assigned the contract to the corporations and because the corporations paid all of the consideration for the franchise, Crossland did not "purchase" it. *See Exxon Corp. v. Dunn, supra* (plaintiff who did not pay for car repairs not a consumer). Even if he had purchased it, the franchise, as an intangible commercial contract right, was not a "good" or "service" within the meaning of the 1973 Act. Tex.Bus. & Com.Code Ann. § 17.45(1) (Vernon 1973) (superseded) (" 'Goods' means *tangible chattels* bought for use.") (emphasis added); *id.* § 17.45(2) (" 'Services' means work, labor, and services *for other than commercial or business use* . . . .") (emphasis added); *see also Snyders Smart Shop, supra,* 590 S.W.2d at 170 (accounts receivable, as intangibles, not goods or services even under broader definitions of 1977 Act).

suit presupposes that the corporation has a right for the shareholder to enforce. *See, e.g., National Bankers Life Ins. Co. v. Adler,* 324 S.W.2d 35, 36 (Tex.Civ.App.—San Antonio 1959, no writ) (derivative action one where "stockholders bring suit for and on behalf of the corporation because the corporation has failed to bring the action"); 15 Tex.Jur.3d *Corporations* § 165 (1981) ("an action, if brought, must be brought by and in the name of the

We thus conclude that neither Crossland nor either of the corporate plaintiffs was a "consumer" under the 1973 DTPA, and thus that none of them may maintain the DTPA claims urged here. We accordingly reverse the judgment of the district court on these claims.[4]

## III. THE ANTITRUST CLAIM.

The plaintiffs alleged that Canteen had tied the purchase or lease of four products to the Canteen franchise: the vending machines involved in the initial sale-leaseback, vending machines subsequently acquired by the plaintiffs, food products, and cigarettes. The jury found no tying of food products, and the plaintiffs have not appealed that determination. Canteen raises a host of objections to the judgment against it on the other tying claims; we need only address a few of those contentions.

### A. The Sale-Leaseback.

It is important to note that the allegedly tied product here is the vending machines Garland leased back from Canteen, and not, as could have been argued, the credit that Canteen effectively extended to Garland. *Cf. United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (credit as tying product). Under the facts of this case, we find that there simply was no tie.

■ A tie is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (footnote omitted). In order to establish a tie, the

corporation"). Here, we have determined that the corporations have no right to recover.

4. Naturally, since the plaintiffs may not recover damages for the alleged DTPA violations, they may not recover their attorneys' fees on those claims. Tex.Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon 1973) (superseded) (prevailing consumer may receive reasonable attorneys' fees); *Marcotte v. American Motorists Ins. Co.,* 709 F.2d 378, 381 (5th Cir.1983).

plaintiffs must prove the existence of: "(1) two separate products, the tying product and the tied product; (2) sufficient market power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market." *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981) (quoting *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir.1974)).

■ The plaintiffs alleged that Canteen compelled them, as a condition of receiving a Canteen franchise, to lease back the equipment the plaintiffs sold to Canteen. This characterization ignores the economic realities of the transaction. There was a single sale-leaseback, not a sale and a separate agreement to lease. The purpose of the arrangement was. to provide the plaintiffs with badly-needed financing without depriving them of the equipment necessary to their business. Since the net result of the sale-leaseback was simply a transfer of title to the equipment in exchange for a loan, and not any transfer of the equipment itself, the transaction simply had no effect on the market for vending machines, the allegedly tied product. The plaintiffs sought to acquire not vending machines but financing. In the absence of an anticompetitive effect in the tied market, there can be no tie. *Bob Maxfield, supra; Driskill, supra.*

### B. Subsequently-Acquired Vending Machines.

The second product that Canteen allegedly tied to the franchise was vending machines to be acquired by the plaintiffs during the life of the franchise. The plaintiffs claimed that Canteen representatives told them that additional machines could only be acquired through Canteen, despite an express provision to the contrary in the franchise agreement. The jury obviously believed the plaintiffs on that point.

■ The finding of liability for this alleged tie nevertheless cannot be upheld, for the plaintiffs proved no damages. In the absence of such proof, the plaintiffs cannot recover. 15 U.S.C. § 15 (Supp. V 1981); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1324 (5th Cir.1976).

In a tying case,

"the ordinary measure of damages would be the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market;" . . . [however,] "[i]n an extraordinary case, the plaintiff might be able to establish a causal relationship between a tying arrangement and other kinds of economic injury."

*Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1054 (5th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) (quoting *Pogue v. International Industries, Inc.*, 524 F.2d 342, 344, 345 (6th Cir.1975)). The plaintiffs argue that the district court improperly instructed the jury to consider as damages only overcharges for the tied products, rather than the alleged decline in the value of Garland's business due to the claimed ties. The short answer to this contention is that the plaintiffs failed to show that this is "an extraordinary case" in which there was a causal relationship between the alleged ties and any decline in the value of the business as a whole. *See id.* In fact, the plaintiffs produced no evidence that they were even overcharged for the subsequently-acquired machines. There was simply no proof that the plaintiffs could have obtained the machines · on any terms more favorable than those offered by Canteen; there was only an assertion by Crossland that he could have gotten the same terms in 1974 and 1975 from another firm that he had gotten in 1972, and that those terms were "better" than Canteen's. No damage award can be based on such imprecise and speculative claims. The only other alleged damage that could have resulted from a vending-machine tie is "discounts lost on new equipment leased from

Canteen" of $5796. There is no proof that the plaintiffs could have received those discounts, or the prices on which those discounts were based, had they purchased the machines directly. Since the plaintiffs proved no damages from the alleged tie of vending machines, they may not recover on this claim.

### C. Cigarettes.

Finally, the jury found that Canteen tied cigarette purchases to the franchise. The analysis of this claim must proceed in two parts, because Garland's situation changed in July, 1975, when it acquired a tax-stamping machine for cigarettes.

■■ Before Garland acquired the stamping machine, the plaintiffs admittedly purchased cigarettes from sources other than Canteen. The only "tie" argued is the fee, equal to two percent of Garland's cost, that Canteen levied on outside purchases. The franchise agreement makes it clear, however, that the two-percent fee was assessed on *all* tobacco purchases, regardless of the seller's identity. The two-percent charge was the form in which Canteen collected franchise fees on tobacco sales; it could have no effect on Garland's choice of supplier, since it applied equally to all. It was clearly not a requirement that "the buyer also purchase[ ] . . . [the tied] product, or at least agree[ ] that he will not purchase that product from any other seller." *Northern Pacific Railway, supra,* 356 U.S. at 5–6, 78 S.Ct. at 518. *See also Magnus Petroleum Co. v. Skelly Oil Co.,* 599 F.2d 196 (7th Cir.), *cert. denied,* 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979) (no tie where plaintiffs only required to purchase 60–80% of their gasoline requirements

from their franchisor). There was thus no tie in this period.

■■ Crossland testified that, after he bought the stamping machine, he believed that Texas law required him to purchase all of his cigarettes from a single source. To be actionable under the antitrust laws, a tie must result from actual coercion based on the economic power of the defendant over the tying product. *Bob Maxfield, supra; Ogden Food Service Corp. v. Mitchell,* 614 F.2d 1001, 1002–03 (5th Cir.1980). Because the single-source requirement stemmed from Crossland's understanding of state law, it cannot be considered a tie imposed by Canteen.[5]

Even though the single-source requirement was not a tie, the question remains whether Canteen coerced Garland into selecting it as that single source. Here again, however, the plaintiffs have proved no damages. Not only was there no evidence that Garland could have purchased cigarettes more cheaply elsewhere (except for a vague statement by Crossland that he believed he could have gotten a better deal from his cousin); Crossland himself testified that having the stamping machine had saved his business money. The plaintiffs also failed to show that this alleged tie was of the extraordinary variety that causes damages other than through overcharges. *Kaiser Aluminum, supra.* Having established no damages, the plaintiffs may not recover. 15 U.S.C. § 15; *Response of Carolina, supra.*

Thus, each of the plaintiffs' tying claims is fatally defective, albeit in different respects. We therefore reverse the judgment on the antitrust claims.[6]

---

5. This would be true even if Crossland's belief had resulted from misrepresentations by Canteen about Texas law. The source of the coercion would still have been his understanding of state law, not Canteen's market power. *See Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 723–24 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (franchisor's false representations that its prices were lower than competitors' did not

establish a tie because no use of economic power to coerce purchase).

6. As with the DTPA claims, *supra* note 3, the reversal of the antitrust judgment necessarily reverses the award of attorneys' fees on the antitrust claims. 15 U.S.C. § 15 ("Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . ." may recover treble damages and attorneys' fees).

## IV. THE FRAUD CLAIM.

The special interrogatories included six questions about each of sixteen representations made by Canteen that allegedly constituted common-law fraud. The jury found for the plaintiffs on seven of the misrepresentations and awarded both actual and punitive damages. Canteen attacks the award on two grounds: first, that the plaintiffs did not produce competent evidence of damages proximately caused by the misrepresentations; and second, that the award is inconsistent with the awards made on essentially identical claims under the DTPA.

### A. Existence of Damages.

Canteen's analysis separates from the other alleged misrepresentations the two that relate to separate DTPA claims: the assurance that Canteen would assume certain equipment leases and the statement that Canteen would calculate equipment rental charges from the equipment's cost (rather than 110% of that cost). We thus also consider those representations separately.

### 1. Assumption of Leases.

■ Canteen's argument that its failure to assume the equipment leases caused no damage is based on the assertion that the agreement provided not only that Canteen would pay the lessor, but also that Canteen would in turn charge the plaintiffs a rental fee for the equipment higher than that charged by the original lessor. Thus, Canteen reasons, the plaintiffs actually benefited by its failure to fulfill the agreement.

On the record, however, this contention cannot stand. Canteen did not show that it did not in fact charge the plaintiffs rent for the machines (the equipment was placed on the list of machines rented to the plaintiffs by Canteen), and it did not indicate what the foregone rentals amounted to. The burden of proof of such a setoff was Canteen's. *Campbell v. Davis,* 563 S.W.2d 675, 679 (Tex.Civ.App.—Tyler), *rev'd on other grounds,* 572 S.W.2d 660 (Tex.1978); 52 Tex.Jur.2d *Setoff, Counterclaim, & Cross*

*Actions* § 64 (1964). The jury was thus entitled to award damages for this misrepresentation.

### 2. Calculation of Rental Payments.

Canteen disputes only the amount of this award, not the fact that an award was made.

### 3. Other Misrepresentations.

The remaining misrepresentations were: (1) that Canteen would not interfere with Garland's conduct of its business; (2) that Canteen's lower prices would save Garland more than the franchise fees and expenses; (3) that Canteen would get Garland a two- or three-percent rebate on cigarette purchases; (4) that Garland would earn more money as a Canteen franchisee than as an independent operator; and (5) that Canteen could procure accounts for Garland with various large companies. Canteen attacks the award on these misrepresentations on two grounds. The first is that the statements were all simply expressions of hope about the future of the business; that under Texas law promises are not fraudulent unless the defendant, at the time it makes the promises, does not intend to fulfill them; and that the jury did not find such intent. The second is that there was no causal connection between the misrepresentations and any damage to Garland.

■ The first contention cannot stand. The district court correctly instructed the jury that a promise to perform in the future is fraudulent only if made with a present intent not to perform. *See Dowling v. NADW Marketing, Inc.,* 631 S.W.2d 726, 727–28 (Tex.1982). There is no reason to believe that the jury did not follow this instruction. The evidence of Canteen's intent not to perform was not so weak that reasonable people could not find for the plaintiffs. Under *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc), the jury's verdict must stand, and under Texas

law it will support an award of damages. *Dowling, supra.*[7]

Similarly, Canteen's argument that the jury could not find that the false representations proximately caused damage must fail. The evidence was clearly sufficient to support such a finding. *Boeing Co. v. Shipman, supra.* Canteen's contention has two parts: first, that the misrepresentations were of a type that could not have harmed the plaintiffs; and second, that the plaintiffs failed to trace any particular loss to any particular misrepresentation.

The falsity of these representations clearly could have damaged the plaintiffs. The statements that Canteen could save Garland more through lower prices than it would charge in franchise fees and that Garland would receive specified rebates on cigarettes were directly harmful, and it was within the jury's power to find that the other misrepresentations caused the plaintiffs to enter into a business arrangement that was disastrous at least in part because the promises were false.

■ Finally, the plaintiffs did not have to trace particular losses to specific misrepresentations. A plaintiff need only prove damages with the degree of exactness that is possible. *Helfman Motors, Inc. v. Stockman,* 616 S.W.2d 394 (Tex.Civ.App.—Fort Worth 1981, writ ref'd n.r.e.). That was done here.[8]

### B. Amount of Damages.

Canteen attacks the award of fraud damages as both inconsistent with and duplicative of the various DTPA claims. Since we have struck down the DTPA awards, there is no longer a duplication problem; the plaintiffs will only recover once for their

injuries. *See McMillen v. Klingensmith,* 467 S.W.2d 193 (Tex.1971) (single-recovery rule); *Bradshaw v. Baylor University,* 126 Tex. 99, 84 S.W.2d 703 (1935) (same).

■ The inconsistency challenge, however, survives our reversal of the DTPA verdict, because the jury's verdict is required to reflect a consistent view of the facts. In reviewing a verdict for inconsistency, a court has a duty under the seventh amendment to reconcile the answers and uphold the verdict if that is at all possible. *Mercer v. Long Manufacturing, Inc.,* 665 F.2d 61, 65–66 (5th Cir.), *aff'd on panel rehearing,* 671 F.2d 946 (5th Cir.1982); *Guidry v. Kem Manufacturing Co.,* 598 F.2d 402, 406 (5th Cir.1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir.1973).

■ The claimed conflict here lies in the fact that the jury awarded $117,000 in actual damages under the DTPA for failure to assume leases, $70,000 in actual damages under the DTPA for failure to calculate equipment rental payments from the cost of the equipment, and $250,000 in actual damages under the DTPA for misrepresentations designed to induce the plaintiffs to enter into the franchise agreement, while awarding only $37,064 in actual damages under the fraud claim for exactly the same conduct. The parties concede that the difference cannot be explained by any acts charged in the DTPA claims but not in the fraud claim, for there were none. The only question, then, is whether the different standards for recovery under the two causes of action can justify the difference in the damages.[9]

---

**7.** Canteen may be arguing that a special issue on contemporaneous intent not to fulfill a promise is required. If so, Canteen is incorrect. *Dowling, supra* (upholding verdict where no such special issue).

**8.** Canteen cites two cases for its tracing theory; both are totally inapposite. *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097 (1938), in fact, states the general rule that uncertainty of the amount of damages will not defeat a plaintiff's recovery. In *Ada Oil Co. v. Dunlop Tire & Rubber Corp.,* 550 S.W.2d 129

(Tex.Civ.App.—Eastland 1977, no writ), the court reduced a damage award for lost car and truck tires because the lower court had found their value to be almost one-third greater than the uncontradicted evidence showed. Neither case even mentions tracing particular dollar losses to specific misrepresentations.

**9.** The plaintiffs argue that the fraud and DTPA verdicts are not inconsistent (and also not duplicative) because they are for different causes of action. This argument overlooks the fact that a party may have suffered the same dam-

The plaintiffs point to four elements that they claim must be shown to recover for fraud but need not be proven in a DTPA case: actual falsity of the representation (rather than deceptiveness), reliance on the false statement, materiality of the statement, and proximate causation of damages (rather than producing causation). For the contention that reliance and materiality are not elements of a DTPA cause of action, the plaintiffs cite *Jim Walter Homes, Inc. v. Chapa,* 614 S.W.2d 838, 841 (Tex.Civ.App.— Corpus Christi 1981, writ ref'd n.r.e.). *Jim Walter,* however, merely stated that special issues on those points were not necessary. As pointed out in *Jay Freeman Co. v. Glens Falls Insurance Co.,* 486 F.Supp. 140, 142 (N.D.Tex.1980), the Texas Supreme Court has held that representations made after the purchase of an insurance policy cannot form the basis of a DTPA claim for denial of benefits under the policy precisely because there could have been no reliance on and thus no damage from the later misrepresentations. *Royal Globe Insurance Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688, 694–95 (Tex.1979). Reliance, therefore, appears to be an element of a DTPA action, and thus is not a basis for reconciling the verdicts here.[10] We need not determine whether materiality is required to recover under the DTPA; since neither the instructions nor the special issues on either fraud or the DTPA mention materiality, it could not have played a role in the jury's deliberations.

We are thus left with two possible distinctions on which the jury may have rested the different damage awards: falsehood rather than deceptiveness, and proximate rather than producing cause, i.e., foreseeable rather than unforeseeable damages.[11] Those elements alone, however, cannot explain the verdict.

To see that, it is only necessary to look at the claim for failure to assume vending machine leases. The jury found that the representation that Canteen would assume the leases had been false and that it had proximately caused damage, so that damage must have been included in the $37,064 awarded for fraud. Under the DTPA, however, the jury awarded $117,000 for the same claim. As the plaintiffs point out, $117,000 is the sum of the payments Garland made on the leases after Canteen was to have assumed them and the balance due on the leases when Canteen took over Garland's business. Neither of those items could possibly be characterized as an unforeseeable result of the failure to assume. The jury verdicts are therefore inconsistent. The remedy is to vacate the award and remand for a new trial on the fraud claims, limited to the issue of damages.[12] *See Mercer, supra; Guidry, supra; Griffin, supra.*

## V. THE CONVERSION CLAIMS.

The plaintiffs appeal from the judgments against them on their conversion claims.

---

ages from each of two different wrongs. In such a situation, the plaintiff may recover the damages only once. *Cf. Bradshaw v. Baylor Univ., supra* (joint tortfeasors). The identity of the damages is the issue here.

10. While the instructions on the DTPA did not expressly mention a reliance requirement, one is clearly implied by the instruction that the jury could only award damages of which the DTPA violation was a producing cause. *See Royal Globe Ins. Co., supra* (no damage caused where no reliance).

11. Canteen attempts to eliminate the foreseeability question by claiming that the instructions on proximate and producing cause were virtually identical. While it does not appear that the district court laid any particular emphasis on this element, foreseeability is included in the instruction on proximate cause but not in the instruction on producing cause. The

jury could therefore have relied on the distinction.

12. Because we vacate the award of actual damages for fraud, we also vacate the award of punitive damages. The plaintiffs argue that our affirmance of the liability finding authorizes us to affirm the punitive damage award, but Texas only permits punitive damages where actual, more-than-nominal damages have been awarded. *Pan Am. Petroleum Corp. v. Mitchell,* 338 S.W.2d 740, 743 (Tex.Civ.App.—El Paso 1960, no writ) ("[P]unitive or exemplary damages can only rest on and must depend upon actual damages."); 17 Tex.Jur.2d *Damages* § 177 (1960) ("[I]f a judgment for actual damages is unsupportable, an award of exemplary damages cannot stand.") The issue of punitive damages should also be retried.

They argue first, that the district court incorrectly directed a verdict against them on the 1975 claim, and second, that the district court erred in entering judgment notwithstanding the verdict on the 1977 claim. We, of course, review both points under the standard set forth in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc): neither directed verdict nor judgment notwithstanding the verdict is proper unless, viewing the evidence in the light and with the inferences most favorable to the nonmoving party, reasonable people could not disagree about the result.

### A. The 1975 Claim.

The parties agree that the applicable statute of limitations is two years. Tex. Rev.Civ.Stat.Ann. art. 5526 (Vernon Supp. 1982). The plaintiffs filed suit on December 5, 1977 (although the conversion claims were not added until an April 17, 1980 amendment), and the alleged conversion was in July or August of 1975, so the statute had clearly run unless there was a basis for tolling it. The plaintiffs argue that the statute did not begin to run until Canteen provided them with a list of the equipment that it had scrapped. A complete list was allegedly not furnished until after this suit was filed, and no list at all was provided until January, 1976.

This contention cannot prevail. The statute begins to run when a plaintiff knows or in the exercise of reasonable diligence should know that the property has been converted. *Las Mendozas, Inc. v. Powell,* 368 F.2d 445, 450 (5th Cir.1966) (Texas law). Here, Canteen actually removed the property from the plaintiffs' physical possession; no one could reasonably find that the plaintiffs did not know of the action, and indeed they do not so contend. Rather, they claim that they could

not determine *which* machines had been taken until the list was provided. Even if one could find that the plaintiffs' inability to determine which machines were missing was not due to a lack of reasonable diligence (a highly doubtful proposition), the list merely confirmed the extent, not the existence of damages. The statute of limitations begins to run when the fact of injury is known, even if the amount of damages is unclear. *McGuire v. Baker,* 421 F.2d 895, 899 (5th Cir.), *cert. denied,* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970) (Texas law). The district court properly granted a directed verdict for Canteen on the 1975 conversion claim.

### B. The 1977 Claim.

Because the directed verdict on the 1975 claim was granted at the close of the plaintiffs' case, the district court carefully instructed the jury not to consider evidence of the 1975 scrapping in its deliberations on the 1977 conversion claim. Nevertheless, the amounts that the jury found as actual damages from the 1977 conversion corresponded exactly with the plaintiffs' evidence of damages from the 1975 incident. The district court gave Canteen judgment notwithstanding the verdict on this claim because of the apparent reliance on the incorrect evidence.

The plaintiffs attack this judgment on two grounds. The first is that the district court refused to admit into evidence an exhibit showing the value of some of the converted equipment. The plaintiffs' evidence unequivocally establishes that the exhibit pertained only to the 1975 conversion. Because the exhibit was relevant only to the time-barred 1975 claim, the plaintiffs suffered no harm even if the exclusion was erroneous.[13] *See* Fed.R.Civ.P. 61 ("The court ... must disregard any error ...

---

13. The plaintiffs also complain of the exclusion of certain evidence demonstrating the value of the equipment involved in the original sale-leaseback transaction. Since that evidence was not relevant to any issue in the case, it was not an abuse of discretion to exclude it. *See* Fed.R.Evid. 402 ("Evidence which is not relevant is not admissible.")

In addition, the plaintiffs contend that the fact that Canteen successfully objected to some of their damage evidence estopped it from complaining that the evidence was insufficient to support the verdict. This is absurd.

which does not affect the substantial rights of the parties.").

The plaintiffs' second argument is that judgment notwithstanding the verdict was not proper under *Boeing Co. v. Shipman, supra.* It could scarcely be clearer that the jury relied on the 1975 figures in rendering its verdict: the two figures (for conversion of machines owned by Garland and for conversion of machines leased by Garland) matched the 1975 evidence to the dollar. A verdict based on irrelevant evidence cannot be sustained. The jury's award of no damages in excess of those figures indicates that it found none. Given the deficiencies in the plaintiffs' proof, particularly in establishing which machines were scrapped in 1977 and which were junked without Garland's consent, we decline to disturb that implicit finding. We therefore affirm the entry of judgment notwithstanding the verdict on the 1977 claim.

## VI. BREACH OF CONTRACT.

Both parties have appealed the verdicts on these claims. We deal first with Canteen's contentions.

Canteen first argues that the jury's awarding of damages to both parties is inconsistent. We repeat that, as a reviewing court, we have a seventh amendment duty to reconcile the verdicts if it is at all possible. *Mercer v. Long Manufacturing, Inc.,* 665 F.2d 61, 65–66 (5th Cir.), *aff'd on panel rehearing,* 671 F.2d 946 (5th Cir.1982); *Guidry v. Kem Manufacturing Co.,* 598 F.2d 402, 406 (5th Cir.1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir.1973). We can do so here. The jury expressly found that Canteen had breached the contract, but its award to Canteen was not necessarily premised on a finding that Canteen did not breach the contract. The jury simply found that $6560 was "owed to Defendant Canteen Corporation by Plaintiffs under the terms of" the contract. The instructions did not require that such an

award be premised on a finding that Canteen had not breached. The verdicts are reconcilable under the view that both parties breached the agreement and each is entitled to damages for the other's breach. This challenge therefore fails.

Canteen's final attack is on the nature of the plaintiffs' proof of damages. Canteen objects to the fact that the plaintiffs claimed that Canteen had undervalued their business in its audit (the breach-of-contract claim), while they simultaneously alleged that their damages under the fraud and DTPA claims should be measured, in part, by the difference between the value of their business before it became a Canteen franchise and its final value as measured by the same Canteen audit. The two theories are clearly inconsistent, but that is not a problem unless the plaintiffs recovered under both theories. The verdicts can be reconciled because there was enough proof of other forms of damages to preclude the inference that the jury necessarily used inconsistent figures.[14] We therefore uphold the verdict. *Mercer, supra; Guidry, supra; Griffin, supra.*

The plaintiffs appeal the district court's refusal to instruct the jury that Texas law implies a covenant of "good faith and fair dealing" in all contracts. This failure is alleged to have diminished the plaintiffs' recovery on their contract claim. The covenant to which the plaintiffs refer has been described as "an implied provision . . . that neither party to the contract will do anything to prevent performance thereof by the other party or commit any act that will hinder or delay performance." *Keener v. Sizzler Family Steak Houses,* 424 F.Supp. 482, 484 (N.D.Tex.1977), *modified on other points,* 597 F.2d 453 (5th Cir.1979) (Texas law); *accord, City of Houston v. Howe & Wise,* 323 S.W.2d 134 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.). There was simply no evidence in this case that Canteen in any way hindered the plaintiffs' perform-

---

14. This is particularly true because the jury awarded the plaintiffs less than $42,000 of the over $200,000 claimed as undervaluation in the audit. Adding this amount to the audit figure still yields a final value for the business well below its pre-franchise value.

ance of the audit contract. Failure to submit an instruction on an issue not raised by the evidence is not error. *Glass Containers Corp. v. Miller Brewing Co.,* 643 F.2d 308, 310 (Texas diversity case).

■ The plaintiffs' final contention is that the district court improperly denied them leave to file a mid-trial amendment to the complaint that would establish the Texas-law prerequisites for recovery of attorneys' fees on their contract claim.[15] This was an abuse of the district court's discretion. Federal Rule of Civil Procedure 15(b) states that when a party objects to a mid-trial amendment, "the court may allow the pleadings to be amended and shall do so freely when ... the objecting party fails to satisfy the court that the ... [amendment] would prejudice him in maintaining his ... defense upon the merits." The only prejudice claimed by Canteen is that it may become liable for attorneys' fees. This is insufficient. *Hodgson v. Colonnades, Inc.,* 472 F.2d 42, 47–48 (5th Cir.1973) (abuse of discretion not to allow mid-trial amendment that would nearly double number of plaintiffs and add $27,000 to back pay liability); 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1495 (1971). The plaintiffs should have the opportunity to amend their pleadings and prove that they are entitled to attorneys' fees on this claim.

## VII. SUMMARY.

The parties have raised many other points, but our disposition of the issues discussed above renders those other contentions superfluous.

In summary:

1. The judgment for the plaintiffs on the antitrust claim is REVERSED and the accompanying award of attorneys' fees is VACATED;

2. The judgments for the plaintiffs on the four DTPA claims are REVERSED and the accompanying award of attorneys' fees is VACATED;

3. The judgment for the plaintiffs on the common-law fraud claim is AFFIRMED as to liability; the awards of actual and punitive damages are VACATED and the claim REMANDED for a new trial on damages;

4. The judgments for the defendants on the conversion claims are AFFIRMED;

5. The judgments for both sides on the contract claims are AFFIRMED; and

6. The contract claim is REMANDED to permit the plaintiffs an opportunity to plead and prove their entitlement to attorneys' fees on that claim.

Each party shall bear its own costs on this appeal.

---

**15.** The plaintiff must allege and prove that the contract claim was presented to the defendant at least 30 days before judgment was rendered. Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon Supp. 1982); *Edinburg Meat Prods. Co. v. Vernon Co.,* 535 S.W.2d 432, 437 (Tex.Civ.App.—Corpus Christi 1976, no writ).